**VAN HOOSE et al. v. WRAY.**

No. 5835.

Court of Appeal of Louisiana. Second Circuit.

June 28, 1939.

Robert A. Crain and Edwin L. Blewer, both of Shreveport, for appellants.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellee.

DREW, Judge.

This is a suit for damages for personal injuries growing out of the careless use of a "bean shooter" by the minor son of defendant. A "bean shooter", as it is commonly called by those who engage in that sport, consists of a small rubber band placed on two fingers of one hand. On this rubber band is placed a bean or some other small pellet, and the band pulled back by the other hand far enough to forcibly propel the pellet forward when the rubber band is released. It is similar to what most boys call a sling shot or "nigger killer", with the two fingers used for the handle or stock. A more proper definition, in the language of the boys of North Louisiana, is a miniature "nigger killer". Only small pellets can be used to shoot with it.

The practice of stinging their friends by shooting them with "bean shooters" is engaged in by many of the high school students, and often by grown-ups in the smaller towns during the dull summer months when many clerks and loafers have nothing better to do to kill time. Those most proficient in the art of using the "bean shooters" are usually loafers who stand around the streets and sting with pellets both friends and strangers, after they have passed, without ever being detected in the act. The rubber band is small and can easily be hidden before the victim has time to turn around. Those who do not see "bean shooters" used never know what stung them. There is no danger in the use of them and no harm can be done with them unless, as in the case at bar, the pellet propelled by the "bean shooter" strikes ·its intended victim in the eye. No other part of the body could be injured by one of them. A pellet thrown from a "bean shooter" will travel only a short distance and never with sufficient force to penetrate any part of the body other than the eye.

On the night of March 15, 1935, Gordon W. Van Hoose, Jr., fifteen years of age, was taking a pleasure ride in his father's automobile. His companion was a young lady in her teens. Both were high school students. They were overtaken by a car in which were four other high school students. The speeds of both cars were reduced to ten or fifteen miles an hour and for a few seconds they traveled along side by side, during which time Van Hoose and an occupant of the other car carried on a friendly conversation. The overtaking car then pulled on ahead of the Van Hoose car. Just as it was in the act of so doing, Charles Wray, son of the defendant and who was in his sixteenth year and an occupant of the back seat of the overtaking car, let go in the direction of the Van Hoose car a flattened out BB shot propelled by a "bean shooter". Unfortunately for all parties concerned, the shot struck young Van Hoose in the eye. He felt the sting of it,

and his young lady companion said she knew something had happened because he began cursing and speeded up in an effort to overtake the other car. Failing in this, he proceeded to drive to his home, where he wakened his father and told him he had been shot in the eye. His father examined the eye and found the flattened out shot hanging on the eyelid. Young Van Hoose then drove the young lady home and drove back to his own home. An eye specialist was called, who directed him to bathe the eye in a solution he prescribed and to come to his office the next morning. The directions were carried out. The doctor's examination on the following morning disclosed the following, as testified to by Dr. Gray:

"A. There was a lesion about eight millimeters to the inner side of the corneal scleral margin of the conjunctive of the left eyeball, about six millimeters long, and beginning about three millimeters above the horizontal line running through the cornea and extending upwards and outwards for six millimeters. There was also sign of a small detachment of the retina at the extreme periphery of the retina, up and in.

"Q. Doctor, will you explain to the court in detail what the retina is? A. Yes sir, we have little nervous membranes which is the innermost lining of the eyeball, and this little nervous membrane is called the retina. This retina is attached to the layer that is just outside of it, which we call choroid, and where the retina gets loose from the choroid, that is a detached retina and that is usually detachment that is due to fluid getting between these two layers."

Dr. Scales examined the eye about three weeks later and found only a small detachment of the retina in the upper nasal part of the eyeball. The other injuries found by Dr. Gray had fully healed by that time.

The treatment prescribed, which was followed in every detail, was rest in bed, flat on his back. At first his head was held as nearly as possible in the same position at all times by placing sand bags on each side of the head. Later, a wooden frame was made to hold his head in proper position. Towels were placed on the inside of the frame to protect the head from the hard boards. Young Van Hoose stayed in this position for six weeks, when he was allowed to get up. The only remaining trouble was the short time it took him to regain his strength. Lying in bed in one position caused constipation and enemas were necessary to be given at intervals. He lost about 20 pounds in weight during the six weeks and was several months regaining it. Lying in one position caused the young man to become somewhat nervous at first, but he soon became accustomed to it. He claims that the possibility of losing his eye caused him some worry, and we do not doubt that it did.

On May 20, following the accident of March 15, Dr. Scales examined the young man and found the eye was entirely healed. The detachment had disappeared, and the eye was normal. In September, following, he entered the Virginia Military Institute and was assigned to the artillery division, which required the riding of caissons and other rough work that is required in the artillery division.

It is contended by plaintiff that the young man's eye is more susceptible to redetachment than it was before this injury occurred, which necessarily causes him to refrain from many activities that other young men of his age engage in. Dr. Gray so testified, but limited this danger to one year after date of injury; and also testified that he had never seen a redetachment in a case where the detachment was as small as in this case. Dr. Scales testified that the eye was no more susceptible to a redetachment than if detachment had never occurred, and saw no reason why the boy could not participate in all normal activities of any boy of his age. He also testified that a trauma detachment was less dangerous than ordinary so-called retina detachment without trauma, which condition presupposes some disease as the cause for it.

Dr. McReynolds of Dallas, Texas, testified that the eye after detachment was more susceptible to redetachment than before; but in answer to the following question: "If you answer that an eye suffering a previous detachment of the retina would be more susceptible to a second detachment, please state whether in your opinion any time limit can be set as to how long this susceptibility would continue? Would you state that the matter was temporary or permanent?" he said: "I would say that the probabilities are that after the patient has made such a complete recovery as the indications are in the present instance, future detachments would not be anticipated."

Young Van Hoose has been engaged in all normal activities since six or eight months after the injury, and no redetach-

ment has occurred. The fact that his doctor advised him not to shoot a gun for six or eight months could not have caused him any damage, as he was in school at Virginia Military Institute during the following fall, and there is no hunting in the summer months, and that is the sport he claims to like and of which he was deprived.

The record fails to disclose that Van Hoose suffered other than slightly and for a very short period of time. We appreciate the fact that it is rather severe punishment to put a healthy boy, 15 or 16 years of age, to bed and require him to lie on his back for 42 days, when his general health is good and the only thing to require him to be in bed is a slight eye injury.

His eye is, according to the evidence, as good as it ever was. He is entitled to no damage on that score. The inconvenience and discomfort caused by being confined to his bed for 42 days, the slight pain and the worry for a short period of time over the possibility of losing an eye, are the only items we can find for which he is entitled to damages. The lower court awarded $500, without itemizing it. We are sure the amount is adequate. The defendant, at his own request, paid medical bills and nurse's or attendant's bills amounting to $399. This was all the expense attached to the unfortunate accident.

Defendant does not question the right of plaintiff to recover under the laws of Louisiana, and the case is before us only on the question of quantum.

We are of the opinion that the judgment of the lower court does justice between the parties, and is a fair award in this case. It is therefore affirmed with costs.